UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ARMORSOURCE, LLC,**

    **Plaintiff,**

    v.

**YOAV KAPAH,** *et al.***,**

    **Defendants.**

:

:

**Case No. 2:18-cv-905**
**Judge Sarah D. Morrison**
**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

This case has an extensive procedural history. The operative pleading is Plaintiff ArmorSource, LLC's Second Amended Complaint. (SAC, ECF No. 94.) Although the SAC names more than ten individuals and entities as Defendants, the only two remaining are Paul Garcia and M4 Consulting, LLC.[1]  The case is now before the Court on ArmorSource's Motion for Summary Judgment against Mr. Garcia and M4.[2] (Mot., ECF No. 169.) Garcia/M4 responded (Resp., ECF No. 172) and ArmorSource replied (Reply, ECF No. 174). For the reasons that follow, ArmorSource's Motion is **DENIED**.

---

[1] This Court entered a Consent Judgment as to Yoav Kapah (ECF No. 148) and an Agreed Judgment Entry as to Pro-Systems USA, LLC, Pro-Systems SpA, and Dott Fabrizio Montagna (ECF No. 108). ArmorSource voluntarily dismissed its claims against Daily Services LLC and Chad Postell (ECF No. 157) and Luna Kapah (ECF No. 162). Default has been entered against Ramona Sockerson (ECF No. 55) and Ballistic Sciences, LLC (ECF No. 130).

[2] Mr. Garcia is the President and sole member of M4. (Garcia Decl., ¶ 2, PAGEID # 2037–42.) Mr. Garcia and M4 consistently refer to themselves as "Garcia/M4." (*See* Resp., *generally*.) The Court will do the same where applicable.

I.  BACKGROUND

    A.  The Parties' Early Relationship

ArmorSource designs and manufactures ballistic helmets for military personnel and law enforcement. (Grunden Aff., ¶ 3, ECF No. 169-1.) Mr. Garcia began providing consulting services to ArmorSource (specifically, a company later acquired by ArmorSource) in 2005. (Garcia Decl., ¶¶ 7–8, PAGEID # 2037–42.) For a fee of $100 per hour, agreed to in a "handshake" deal, Mr. Garcia helped his client secure government contracts for the sale of ballistic helmets. (*Id.*) In 2009, Mr. Garcia entered into a written Consulting Agreement with ArmorSource under which he would be paid $125 per hour, plus expenses. (2009 Consulting Agreement, 1–2, PageID # 2043–50. *See also* Garcia Decl., ¶ 10.)

    B.  The 2012 Consulting Agreement

Until the end of 2011, Mr. Garcia worked "full-time" for ArmorSource. (Garcia Decl., ¶ 11.) That year, ArmorSource began to experience financial difficulties due to the expiration of large contracts, a government investigation into a subcontractor's manufacturing processes, and a decrease in demand.[3] (*Id.*, ¶ 12.) In early 2012, ArmorSource's majority owner unexpectedly passed away and Yoav Kapah was appointed President and CEO. (Grunden Aff., ¶ 5.) Shortly thereafter, Garcia/M4 and ArmorSource entered into a superseding Consulting Agreement, under which Garcia/M4 would be paid a monthly retainer of $5,000, plus expenses and a $1.00 per unit commission on certain helmets sold. (2012 Consulting

---

[3] ArmorSource does not dispute Mr. Garcia's characterization of its 2011 financial position. (*See* Reply, *generally*.)

2

Agreement, PAGEID # 1904–05, 1914, ECF No. 169-3.) The 2012 Consulting Agreement resulted in a reduction of Mr. Garcia's compensation. (Garcia Decl., ¶ 13.)

The parties tell very different stories about what happened next.

### C. ArmorSource's Position

According to ArmorSource, Garcia/M4 and Mr. Kapah then devised and implemented a kickback scheme pursuant to which they defrauded ArmorSource and conspired to steal nearly $1 million from the company.[4] (Mot., 1.) To support its theory, ArmorSource proffers various documents and affidavits showing that (i) between 2012 and 2017, Garcia/M4 submitted invoices requesting compensation in excess of that contemplated by the 2012 Consulting Agreement[5] and (ii) in 2015 and 2016, each time ArmorSource paid an "inflated" M4 invoice, M4 made a corresponding transfer into Mr. Kapah's personal bank account. (Smith Aff., ¶ 6, ECF No. 169-4.)

Mr. Kapah states in a sworn affidavit that Mr. Garcia approached him with

---

[4] Mr. Kapah has pled guilty to theft, tampering with records, and tax-related charges. (Mot., 6. *See also State of Ohio v. Kapah*, No. 2018 CR 00133 (Licking Cty. Ct. C.P.).) He was sentenced to serve four years and nine months in prison and ordered to pay $1.7 million in restitution to ArmorSource. (*Id.*)

[5] Brad Grunden, current President of ArmorSource, states in a sworn affidavit that, aside from the 2012 Consulting Agreement, "[t]here were no other agreements between ArmorSource and M4, or any entity or individual associated with M4." (Grunden Aff., ¶ 6.) Mr. Grunden's statement is contrary to other evidence in the record, including an August 1, 2017 letter agreement, signed by Mr. Grunden, setting forth the scope and terms of services to be provided by Garcia/M4 during the period of August and September 2017. (Aug. 1, 2017 Letter, PageID # 2141.)

3

an offer to pay Mr. Kapah kickbacks in exchange for approving higher fees and commissions for Garcia/M4. (Kapah Aff., ¶ 10, ECF No. 169-2.) Mr. Kapah goes on to state:

> I agreed to this scheme and approved the increase. My bank records from 2015, 2016, and 2017 reflect that the kickbacks paid by Garcia and M4 to me totaled $239,141. I used my influence as President and CEO to approve the increased payments to M4. I did not disclose to any officer, director, manager, or employee of ArmorSource that I was receiving a kickback from the increased payments to M4. I provided no services to Garcia or M4. This scheme was orchestrated for the sole purpose of enriching Garcia, M4, and me at the expense of ArmorSource.

(*Id.*, ¶¶ 11–16.) Mr. Kapah was terminated from his position in July 2017, after which time ArmorSource discovered the scheme. (Grunden Aff., ¶ 7.)

### D.  Garcia/M4's Position

Garcia/M4 deny ArmorSource's allegations and maintain that "every penny of the compensation ArmorSource paid" to Garcia/M4 properly reflected the parties' agreed-upon compensation structure at the time of the payment. (Garcia Decl., ¶¶ 34–35.)

Garcia/M4 assert that they entered into a number of agreements with ArmorSource both before and after the 2012 Consulting Agreement. In his sworn declaration, Mr. Garcia states that he approached ArmorSource in December 2012 "about restoring [his] contractual arrangement to terms identical to the 2009 Consulting Agreement. . . .—i.e., $125 per hour, expenses reimbursed[.]" (*Id.*, ¶ 15.) Mr. Garcia presented his proposal in a meeting with Mr. Kapah and ArmorSource HR Manager, Mary Byers. (*Id.*) Although Garcia/M4 do not proffer a fully-executed agreement, Mr. Garcia testifies that ArmorSource accepted his proposal. (*Id.*, ¶ 15.)

4

He notes that invoices for the period of January 2013 through February 2014 are consistent with that compensation structure. (*Id.*, ¶ 16. *See also* ECF No. 110-1, PAGEID # 1459–74.)

Mr. Garcia states that Garcia/M4 proposed another contract modification in March 2014, and that Mr. Kapah, "in his capacity as an officer of ArmorSource," accepted those terms.[6] (Garcia Decl., ¶ 17. *See also* 2014 Consulting Agreement, PAGEID # 2128–33.) According to Mr. Garcia, the 2014 Consulting Agreement entitled Garcia/M4 to payment on the same terms as the 2009 Consulting Agreement, plus commissions to be negotiated on a contract-by-contract basis. (Garcia Decl. ¶¶ 17–18. *See also* 2014 Consulting Agreement, § 3.) Mr. Garcia further testifies that every commission paid under the 2014 Consulting Agreement was negotiated with and approved by ArmorSource's then-CFO Dustin Wissinger. (Garcia Decl., ¶¶ 21–25, 30. *See also* Feb. 23, 2017 Email, PAGEID # 2137.)

A final modification was agreed upon in 2017 after ArmorSource notified Garcia/M4 of their intent to terminate the contract. (Garcia Decl., ¶ 32–33.) The resulting letter agreement, dated August 1, 2017 and signed by Brad Grunden, provided for payment at a rate of $125 per hour, plus certain expenses and commissions on units sold. (Aug. 1, 2017 Letter, PageID # 2141.)

To rebut ArmorSource's claims, Garcia/M4 emphasize that several ArmorSource employees *other than Mr. Kapah* were involved in their dealings. According to Mr. Garcia, Garcia/M4 submitted detailed invoices to ArmorSource

---

[6] Again, Garcia/M4 are unable to proffer a fully-executed agreement.

5

Controller Mary Binkley, with copies to Mr. Kapah and the CFO (Mr. Wissinger or his predecessor, Tim Tallentire). (Garcia Decl., ¶¶ 19, 26, 28.) In addition, although "numerous employees and officers at ArmorSource were provided with, or had access to, [the Garcia/M4] invoices"—including Mr. Grunden, Mr. Wissinger, Mr. Tallentine, Ms. Byers, Ms. Binkley, and the company's founders—none ever questioned Garcia/M4's charges. (*Id.*, ¶ 27.)

Finally, Mr. Garcia does not dispute that he made regular payments to Mr. Kapah. Instead, he argues that he, too, was "swindled." (*Id.*, ¶ 37.) Mr. Garcia and Mr. Kapah had partnered "50/50" on a venture called Ballistic Sciences.[7] (*Id.*, ¶ 38.) Ballistic Sciences "developed business for military equipment manufacturers" and had only one client. (*Id.*) When Ballistic Sciences made member distributions, they "ran payments through the M4 bank account." (*Id.*, ¶ 39.) In other words, some of the M4 transfers to Mr. Kapah were not connected to ArmorSource's business, but to Ballistic Sciences'. (*Id.*, ¶ 39.) Mr. Garcia asserts that the remaining transfers to Mr. Kapah were "essentially loans." (*Id.*, ¶ 40.) Mr. Garcia explains that Mr. Kapah was "in financial trouble," and "helping [him] seemed like a risk worth taking. (*Id.*) So, Mr. Garcia agreed to "transfer 50% of [his] commissions from ArmorSource until [Mr. Kapah] got on his feet." (*Id.*) Those amounts have never been repaid. (*Id.*, ¶ 41.)

---

[7] Mr. Kapah's affidavit details a separate kickback arrangement involving Mr. Garcia, Ballistic Sciences, Mr. Montagna, and the Pro-Systems entities. (Kapah Aff., ¶¶ 18–29.)

6

## II. ANALYSIS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

ArmorSource's remaining claims—for fraud, racketeering, and conspiracy—are all premised on the alleged illegal kickback scheme between Garcia/M4 and

7

Yoav Kapah. ArmorSource argues that it is entitled to summary judgment because there is no genuine dispute as to any material fact. The Court disagrees. The record, summarized above, reveals a number of genuine disputes, including as to (i) the existence of a coordinated kickback scheme, (ii) the legitimacy of the payments made by ArmorSource to Garcia/M4, and (iii) the legitimacy of the payments made by M4 to Mr. Kapah. Resolution of these disputes will require a determination on the credibility of Messrs. Garcia, Kapah, and Grunden, and their competing testimony. That is the province of a jury. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]"). The evidence is not "so one-sided that one party must prevail as a matter of law," *id.*, 477 U.S. at 252—far from it.

Accordingly, ArmorSource's Motion for Summary Judgment (ECF No. 169) is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**

8